# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MARY M. GIORDANO RUPPERT,               )
            Plaintiff,                  )
      v.                                )
                                        )      Case No. 18-cv-0148 (CKK)
ANDREW SAUL,                            )
Commissioner of                        )
the Social Security Administration,[1]  )
                                        )
            Defendant.                  )
_____ )

## MEMORANDUM OPINION
(January 13, 2020)

Pending before this Court are Plaintiff's [13] Motion for Judgment of Reversal (Pl.'s Mot.)

and [13-1] Memorandum in support thereof ("Pl.'s Mem."); Defendant's [14] [Consolidated]

Motion for Judgment of Affirmance/Opposition to Motion for Judgment of Reversal and

Memorandum in support thereof ("Def.'s Mot."); and Plaintiff's [16] Reply.[2]  Plaintiff Mary M.

Giordano Ruppert ("Plaintiff" or "Ms. Ruppert")  requests reversal of the decision by the Acting

Commissioner of the Social Security Administration ("SSA") to deny Plaintiff disability insurance

benefits. Plaintiff alleges that the Administrative Law Judge who issued the decision:

> (1) ignored the time off work and time off task required for Ms. Ruppert's required medical
> treatment; (2) failed to state his specific reasons for deciding that Ms. Ruppert's
> impairments, alone or in combination, did not meet or medically equal any of the listings
> in 20 C.F.R. Pt. 404, Subpt. P; (3) failed to find Ms. Ruppert disabled under Listing 4.05
> (recurrent arrhythmias) and Listing 12.02 (neurocognitive disorders); (4) misstated the
> record with regard to the frequency, duration, intensity, and severity of her disabling

---

[1] Pursuant to Fed. R. Civ. P. 25 (d),  Andrew Saul, Commissioner of the Social Security
Administration has been automatically substituted for Nancy Berryhill, Acting Commissioner of
the Social Security Administration, whom the parties' pleadings name as Defendant.

[2] In issuing this Opinion and the accompanying Order, this Court has considered the parties'
motions as well as the entire Administrative Record, ECF No. 10.

symptoms; (5) having significantly misstated Ms. Ruppert's daily activities, was left with only the inaccurate and impermissible, sole rationale that her symptoms were unsupported by objective evidence; (6) failed to explain how he reached his conclusions regarding Ms. Ruppert's residual functional capacity in his question to the vocational expert, including working on a regular and continuing basis; and (7) failed to give controlling weight to the well-supported opinions of four of her treating specialists.

Pl.'s Mot. for Reversal, ECF No. 13, at 1-2 (substituting numbers (1)-(7) above for letters (A)-(G) in the original).

Upon consideration of the pleadings, and for the reasons set forth herein, the undersigned finds that some of Plaintiff's arguments warrant remand of the Defendant's decision. Accordingly, the Court **DENIES IN PART AND GRANTS IN PART** Plaintiff's Motion for Judgment of Reversal, **DENIES** Defendant's Motion for Judgment of Affirmance, and **REMANDS** this matter to the Social Security Administration for further proceedings.

## I. Background

Plaintiff Mary M. Giordano Ruppert is a 51-year-old female who resides in Washington, D.C. (Administrative Record ("AR") [10] 50, 78.)[3] She was 44 years old on her disability onset date of October 9, 2012. (AR 78.) She has a master's degree in systems engineering, AR 50, and she was a senior associate for a defense contractor — Booz Allen Hamilton — from July 1990 to October of 2012, with a one year break in 2000-2001, when she served as a vice president of public relations in a public relations firm. (AR 50-51.) On March 10, 2014, Plaintiff filed an application for benefits under Title II of the Act, alleging disability due to Postural Orthostatic Tachycardia Syndrome ("POTS"), post-concussive syndrome, migraines, vestibular cognitive deficit, low blood pressure, diabetes insipius, anxiety, depression, neuropathy, and fibromyalgia. (AR 195-196, 229). Prior to an automobile accident in April 2012, where Plaintiff suffered a concussion,

---

[3] The Court references the page numbers located at the bottom righthand corner of the administrative record.

Plaintiff had already been diagnosed with POTS, fibromyalgia, and small fiber neuropathy, but she was working with accommodations, including working at home one day a week and undergoing daily 2.5 hour IV saline infusions to stabilize her blood pressure (where the infusions were sometimes administered at her office). (AR 69-71, 1388.) Plaintiff attempted to return to work after the accident; however, by August 2012, her physicians recommended ceasing work due to her worsening symptoms. (AR 1389.) She continued to attempt to work, but after a possible second concussion in October 2012, she ceased working on October 10, 2012. (AR 1389.)

Plaintiff's application was denied initially and upon reconsideration. (AR 78-93, 94-110.) Thereafter, Plaintiff requested an administrative hearing, and United States Administrative Law Judge ("ALJ") Andrew M. Emerson held an administrative hearing, which lasted approximately one hour. (AR 131-133, 45-77.) At the hearing, Plaintiff was represented by a non-attorney representative. ALJ Emerson issued his Decision denying Plaintiff's application. (AR 18-37.) Plaintiff requested a review of ALJ Emerson's decision, but the Appeals Council denied Plaintiff's request for review. (AR 1–7.) As ALJ Emerson's decision constitutes a final agency decision, Plaintiff is entitled to judicial review in this Court under 42 U.S.C. § 405(g).

## A. Evidence Before the ALJ

The evidence before ALJ Emerson consisted primarily of: (1) medical records spanning from April 2012 through June 2016, including medical records from doctors who treated Plaintiff and reports from state agency physicians who reviewed her records; (2) earnings records; and (3) Social Security Administration ("SSA") disability reports completed by Plaintiff and her husband. The evidence also included testimony by Plaintiff and by Charlotte Dixon, a vocational expert, during the hearing held by the ALJ.

1. Plaintiff's Medical Records[4]

Plaintiff's medical records spanning April 2012 through December 2013, from an unknown source, indicate a diagnosis of Postural Orthostatic Tachycardia Syndrome ("POTS") and Neurobehavioral Symptoms including pain, nausea, collapse, sudden fatigue with stimuli, difficulty paying attention and remembering things, slowed thinking and brain fog. (AR 391, 393.) Plaintiff was provided IV infusions, speech therapy, physical therapy and acupuncture. (AR 396-408.)[5]

In late October of 2012, after hitting and reinjuring her head twice that month, Plaintiff went to the emergency room and was diagnosed with concussive syndrome and advised to begin brain rest and to start Lorazepam and Prozac. (AR 380, 434, 698-699, 716.) She used Sumatriptan for migraines, but she could not take Lyrica because it caused dizziness. (AR 434, 699.) In November 2012, Plaintiff was advised by Dr. Rhanni N. Herzfeld, a neurologist from the Neurology Center, to schedule an MRI of her brain and cervical spine, as she had severe neck pain, and she was further advised to undergo a formal neuropsychological assessment and an EEG. (AR 330-331.) On October 23, 2012, Plaintiff reported to Dr. Weiss, her primary care physician, who listed her underlying medical conditions as POTS, diabetes and fibromyalgia, and her current

---

[4] Plaintiff's medical records are voluminous, span a number of years, and originate from many sources. This Court has attempted to organize the records in chronological order even though they were not presented that way. The Court notes that some of Plaintiff's medical records list no medical source, some are undated, and some are duplicative. Plaintiff's treating sources include: (1) Alan Weiss, M.D., internist; (2) Rhanni Herzfeld, M.D., neurologist; (3) Jessica Clark, Ph.D., neuropsychologist; (4) Marilyn Kraus, M.D., neurologist; (5) Robert Jacobs, O.D., neuro-optometrist at Developmental Optometry; (6) Maura Collins, speech language pathologist; (7) Dennis Fitzgerald, M.D., otolaryngologist; (8) Elizabeth Kingsley, M.D., cardiologist; (9) Heather Carr, D.P.T., physical therapist; (10) Heechin Chae, M.D., neurologist; and (11) Gregory O'Shanick, M.D., neuropsychiatrist and Medical Director at the Center for Neurorehabilitation.
[5] Medical Records at AR 393-408 were provided by Claimant and are from an unknown source.

symptoms as recurrent syncope fatigue, nausea, weakness, migraine, chronic pain, dehydration, recurrent viral infections. He indicated that her disability started on October 10, 2012, and the end date was unknown. (AR 1086.)

Dr. Weiss issued a physician recertification statement on November 27, 2012, wherein he noted that Plaintiff's expected return to work (modified duty) was January 15, 2013. (AR 1085.) Plaintiff was evaluated by Dr. Marilyn Kraus, then-Director of the Concussion Program at Medstar National Rehabilitation Hospital on December 6, 2012, with complaints of fatigue and sleep problems, blurry vision, chest pain and fainting, nausea and incontinence. She reported pain of 5/10 in the back of her head for the previous 7 months. Plaintiff was taking Prozac and Lorazepam. Dr. Kraus noted that Plaintiff was a patient with a complex prior medical history of POTS and diabetes and migraine, who sustained a concussion. Plaintiff was referred to urology and for a balance evaluation/therapy at her physical therapy; she was kept on her medication and prescribed a low dose of Gabapentin. She was scheduled for a follow-up appointment in two weeks. (AR 698-702.)

On December 6 and 7, 2012, Plaintiff was evaluated by Dr. Jessica Clark, neuropsychologist at MedStar, for possible mild traumatic brain injury. Dr. Clark noted that details provided by Plaintiff were consistent with having suffered a concussion due to a car accident in April 2012, but it was unclear whether Plaintiff's reinjury in October 2012 was a second concussive injury. During the period of August through October 2012, Plaintiff experienced a prolonged course of recovery corresponding with work stress. It was noted that Plaintiff's situation was complicated by a pre-injury history of POTS, diabetes and fibromyalgia. Plaintiff was encouraged to rest and build up to a higher activity level gradually; to follow-up with her

physicians regarding her medical issues and with a neuropsychologist who understood the psychological component of her situation; and to try relaxation techniques. (AR 378-383.)

Plaintiff had a December 18, 2012 follow-up visit with Dr. Kraus, where she reported that her mood had improved but her fatigue was still an issue, along with headache, neck pain, nausea and dizziness. Dr. Kraus recommended that Plaintiff stop Prozac and start Sertraline, continue the Gabapentin, obtain an MRI and EEG, and follow-up with her in four weeks. (AR 703-706.) Plaintiff's MRI indicated that she had mild to moderate foraminal stenosis bilaterally, which had not changed from the previous study and mild right foraminal stenosis at C4-C5 with mild unconvertebral joint arthropathy. (AR 329.) Her EEG was normal. (AR 326.)

Dr. Weiss issued a physician recertification statement in January 2013, where he noted that Plaintiff's anticipated return to work (modified duty) was September 1, 2013, and further, that Plaintiff was seeing Dr. Hertzfeld and Dr. Kraus and attending physical therapy. (AR 1084.) Plaintiff followed up with Dr. Kraus on January 17, 2013, and she reported feeling a bit better with her POTS under control unless she overdid her activity level. She had switched from Prozac to Sertraline with an improvement in mood and the Gabapentin was helping with sleep. Plaintiff had a vestibular evaluation and started treatments. She was provided with an order for speech therapy. (AR 709-711.) Plaintiff visited Dr. Kraus again on February 21, 2013, where she reported feeling worse, angry, anxious, and hypersensitive to noise. The results of Plaintiff's neuropsychological testing showed average basic attention, variable speed of information processing, low average working memory, variable executive functioning, intact basic attention and verbal learning and memory, and symptoms of depression and anxiety. Plaintiff was diagnosed with cognitive disorder; and told to continue with vestibular therapy and other therapy, reduce Gabapentin, use Alprazolam in lieu of Lorazepam, and increase Sertraline. (AR 712-715.)

Plaintiff visited Dr. Herzfeld at the Neurology Center again on March 14, 2013, where she reported significant improvement in her occipital headaches but migraines up to three times per week and mood problems occurring after she spent time on the computer. She was diagnosed with post concussive syndrome with gradual improvement but continued hypersensitivity. She was advised to continue brain rest and to increase her dosage of Gabapentin. (AR 324.)

On March 28, 2013, Plaintiff was examined by Dr. Weiss, who diagnosed her with post-concussive syndrome. Dr. Weiss noted that Plaintiff needed to resolve her cognitive dysfunction, and it would take more than 6 months for any fundamental changes in her medical condition. He noted restrictions in walking, lifting, speaking, sustained mental or physical activities, and continuing anxiety; however, Plaintiff was able to operate a motor vehicle. (AR 1078-1080.) On April 23, 2013, Dr. Weiss wrote a letter in support of Plaintiff's claim for disability, noting that her medical conditions included POTS, chronic fatigue syndrome, fibromyalgia, recurrent syncope, dehydration and autonomic neuropathy. Her overall condition had been improving prior to a car accident in April 2012, when she began to experience migraines, sleep disturbance, nausea and cognitive issues. Dr. Weiss diagnosed her with a traumatic brain injury and prescribed Zoloft, Midodrine, and Gabapentin. Dr. Weiss noted that Plaintiff was restricted in the amount of time she could stand or walk; she frequently collapsed, was sensitive to stimuli and unable to sustain her focus. He noted that Plaintiff had begun to slowly improve with physical therapy and medication and psychological therapy for her anxiety, depression and behavioral issues. He concluded that it was inconceivable that she would be able to return to work any time soon and advocated for full disability. (AR 1173-1174.)

On May 6, 2013, Plaintiff visited Dr. Kraus, where she reported that she felt better overall in terms of her mood, her mental energy, and her gait, but she was still experiencing

overstimulation and she sometimes needed a cane for walking. Plaintiff had reduced her Gabapentin and was using Alprazolam instead of Lorazepam, and she had increased her Sertraline. Her pain was assessed as 8/10, and Dr. Kraus evaluated her as still being very impaired. Plaintiff was using a memory notebook and discussed returning to work on a limited basis. Plaintiff was prescribed Sumatriptan, Zoloft, and Gabapentin. (AR 717-721.) On July 2, 2013, Plaintiff had a follow-up visit with Dr. Kraus, where she reported that her port had been infected and she had been in the hospital for that; her nausea and dizziness were worse; the hypersensitivity was still there; and while they had discussed a return to work at the last visit, with the setback, Plaintiff was not ready to do more yet. Plaintiff's pain was rated a 7/10. Her dosage of Gabapentin was increased, and she remained unable to return to work. (AR 722-725.)

On or about July 13, 2013, Plaintiff was treated in the Emergency Room at the Community Hospital of the Monterey Peninsula for left arm pain at her PICC line site. (AR 341.) On July 14, 2013, Plaintiff was admitted to the Community Hospital for two days, and she was diagnosed with sepsis and given a 10-day course of Ciprofloxacin, an antibiotic. (AR 354-355.) On October 21, 2013, Plaintiff saw Dr. Kraus, and she described her pain as generalized and rating a 3/10. Plaintiff's balance was unsteady, but her coordination and posture were normal. Plaintiff indicated that she had another port in place for her infusions for her POTS. She noted dizziness was still an issue triggered by overexertion or too much stimuli. Her nausea was also worse, but her cognition was better. Dr. Weiss had taken Plaintiff off Gabapentin because of several aggressive episodes. Plaintiff was referred to another doctor to assess her dizziness; her Sertraline was increased, and she was told to use fish oil. (AR 726-729.)

On November 4, 2013, Plaintiff consulted with Dr. Dennis Fitzgerald at Medstar Washington Hospital Center regarding her chronic dizziness, and she was scheduled for testing

and a return visit. (AR 988-990.)  During September through November, 2013, Plaintiff attended speech and language treatment with Ms. Maura Collins.  (AR 1280-1285.)

Dr. Weiss prepared for Plaintiff a Plan of Treatment for the period November 15, 2013 through January 13, 2014, whereby he noted IV hydration for 2-3 hours daily and cleaning and monitoring of the insertion site. (AR 409-410.)  Plaintiff's medical records from Coram Specialty Infusion Services show that Plaintiff was previously receiving IV infusions of saline daily and IV infusions of Privigen every 4 weeks, at least at some points throughout 2011 -2013.  (AR 514, 518 – 532.)

On December 11, 2013, Plaintiff was interviewed and examined by Dr. Ross Myerson (Occupational Medicine), who was conducting an independent medical evaluation.  Dr. Myerson characterized Plaintiff's conditions as follows: chronic fatigue, brain fog, episodic weakness, POTS, vestibular dysfunction, and recent cognitive problems. He noted that the physicians involved in her care were: Dr. Alan Weiss; Dr. Marilyn Kraus; Dr. Jessica Clark; and speech-language pathologist Maura Collins. Plaintiff had been prescribed Desmopressin Acetate, Midodrine, Sertraline, potassium supplements, Sumatriptan, Alprazolam, and a Port-a-Cath for saline infusions 4-6 times per week.   She was seeing an internist practicing integrative medicine, a neuropsychologist and a speech and language pathologist.  Dr. Myerson opined that no specific physical functional impairments were identified during his examination or in the medical records nor were the Plaintiff's medical diagnoses supported by his examination or the records.   Dr. Myerson concluded that he could not estimate the Plaintiff's abilities, and he believed that the Plaintiff's overall condition was psychiatric in nature with some possible medical issues. (AR 1257-1266.)

On December 11, 2013, Plaintiff reported for an audiology evaluation at Medstar Washington Hospital Center, with Dr. Rita Ball-Murphy, where she reported hearing loss, tinnitus, ear pain, and problems with balance. The pressure test for Plaintiff's right ear was abnormal, and she was advised to follow-up with an ENT doctor. Her medication list at that time included Ddavp Rhinal Tube Soin, Alprazolam, Zoloft, Sumatriptan, Midodrine Hcl, Klor-con, Normal Saline Flush for two hours daily, and Sertraline. The results of Plaintiff's testing indicated an abnormal right ear (with positive pressure). She was recommended for an ENT and Neurology follow-up. (AR 413-414.)

Plaintiff visited Dr. Elizabeth Kingsley, cardiologist, for a cardiovascular consultation on December 16, 2013, based on a complaint of a history of postural orthostatic tachycardia syndrome with autonomic neuropathy. Dr. Kingsley noted that Plaintiff had been managing her POTS syndrome for the past 11 years with saline IV treatments 6 days a week and monthly infusions. Dr. Kingsley noted that Plaintiff discontinued her job because of disability; she had post-concussive syndrome; she was hospitalized in July 2013 for septicemia; and she reported to her with chest discomfort, dizziness, balance and vestibular problems. Plaintiff's assessment and plan included hydration, salt tablets, an echocardiogram, treadmill exercise, bone density screening and possibly adding Ritalin to her medications. (AR 421-422.) When tested, Plaintiff's bone density was normal. (AR 424.) On December 20, 2013, Plaintiff consulted with Dr. Fitzgerald about her ears, more specifically her dizziness/loss of balance and the on and off ringing and fullness in her right ear. Dr. Fitzgerald indicated that Plaintiff was going to be scheduled for surgery. (AR 973-975.)

On January 24, 2014, Dr. Kingsley noted that Plaintiff exhibited physiology (post-exercise drop in blood pressure) compatible with post-exercise vasodilation, and she recommended support

hose and avoidance of exercise, especially while standing up. She also suggested salt tablets. Plaintiff's exercise treadmill test had to be stopped early because of Plaintiff's shortness of breath and lightheadedness. (AR 458, 460.)

During the period from January 2012 through March 2014, there are numerous medical records from Potomac Home Health Care relating to Plaintiff's "port care." These records regularly indicate that Plaintiff expressed neurological symptoms of dizziness, fatigue and weakness, but they also contain frequent commentary that the patient was not having new pain. (AR 541-637.)

On February 20, 2014, Plaintiff followed up with Dr. Kraus, and she reported neuropathic pain in her leg and all over, pain in both ears, an upcoming vestibular surgery in March, two migraines per month, more sensitivity to light, being overwhelmed by stimuli, no change in cognition but worse nausea. Dr. Kraus prescribed Ritalin to help with fatigue and concentration. (AR 730-735.) Around March 5, 2014, Plaintiff was admitted to the emergency room at the Johns Hopkins Medical facility with complaints of dehydration from lack of IV fluids and upper chest tightness. (AR 1143-1150.) On April 15, 2014, Plaintiff met with Dr. Weiss, who noted that Plaintiff could not sustain physical or mental activities, must restrict stimuli and stress, and must rest frequently. Plaintiff was diagnosed with low blood pressure and cognitive dysfunction, and given a fair prognosis. Fundamental improvement in her condition was expected to take more than 6 months. (AR 1088, 1093.)

Dr. Weiss's letter dated April 4, 2014 indicates that Plaintiff was unable to concentrate for more than brief periods of time as she had post-concussive syndrome and a possible fistula in her right ear, and she experienced recurrent episodes of collapsing, agitation, and impaired cognitive function. Plaintiff was being treated with multiple medications, including saline infusions, and

gamma globulin therapy. Plaintiff had seen a cardiologist who noted post-exercise vasodilation consistent with Plaintiff's POTS and autonomic neuropathy. (AR 1269.)

On April 29, 2014, Dr. Kraus reported that Plaintiff reported some cognitive benefit from Ritalin and was looking into a Beta blocker for her POTS. Plaintiff noted further that she had a short temper, she was getting migraines 3 times per month, her neuropathic pain was worse, and she still experienced overstimulation. Plaintiff was instructed to continue with Dr. Clark, referred to physical therapy, given an increased dosage for Methylphenidate, and told to follow-up in ten weeks. (AR 872-876.) Medical records from Dr. Kraus dated May 15, 2014 indicate that Plaintiff was close to achieving her maximum medical improvement, and her prognosis was guarded as Plaintiff was still symptomatic. Plaintiff's physical and mental impairments were indicated to be moderate. (AR 1091.)

During 2014, Plaintiff attended outpatient psychological sessions at MedStar to address her diagnosis of Adjustment Disorder with Mixed Anxiety and Depression, although she canceled several appointments. (AR 736-744.) Plaintiff was treated by Constance Maravell, doctor of oriental medicine (DOM) and licensed acupuncturist, for 7 years, and Ms. Maravell opined that, as of April 24, 2014, Plaintiff could not resume work due to the progressive deterioration of her health since the car accident. (AR 749-864.)

On approximately June 24, 2014, Plaintiff reported to the emergency room at the Anne Arundel Medical Center suffering from dehydration. Plaintiff reported that she could not get her port to work and missed a day, and she became dizzy and nauseous. (AR 907-931.) On June 27, 2014, Plaintiff reported to Georgetown University Hospital, where she underwent an operation on her right ear in response to her diagnosis of vestibular disorder. (AR 933-967.) On July 17, 2014, Plaintiff followed up with Dr. Fitzgerald, where it was noted that her fistula problems had

improved, and Plaintiff was scheduled for a post-op audio test. (AR 968-970.) On July 18, 2014, Plaintiff consulted with Dr. Kraus with complaints of fatigue and sleep problems, decreased hearing and ear pain, nausea, and loss of balance. Plaintiff's pain in her legs and pressure in her ear was rated a 4/10. Plaintiff was referred to a tinnitus clinic, given a prescription for Ritalin twice per day, and scheduled for a follow-up in 12 weeks. (AR 1003-1007.)

On October 20, 2014, Plaintiff was evaluated by Dr. Jessica Clark, a neuropsychologist, who found that Plaintiff had applied focus and concentration for 30-50 minute periods and reasoning/judgment within normal limits. Dr. Clark noted that Plaintiff was able to drive, and she shared with her husband household activities of cleaning/maintaining her residence, performing routine shopping, and paying bills. Dr. Clark noted that Plaintiff was unable to return to work until her physical status improved. (AR 1096-1098.) On October 29, 2014, Plaintiff was evaluated by Dr. Weiss, and she was able to sit for 4 hours and stand/walk for 2 hours, could use her hands but not sustain an activity and could occasionally lift up to 20 pounds, climb, balance, stoop, kneel and crouch. Dr. Weiss opined that Plaintiff suffered from fatigue and pain that were disabling from working full time at even a sedentary position. (AR 1100-1105.) On December 4, 2014, Plaintiff was admitted to MedStar Washington Hospital Center with dizziness after falling and hitting her head the day before. (AR 1106-1141.) On January 26, 2015, Plaintiff was admitted to Sibley Hospital for vertigo. She was advised to see an endocrinologist to evaluate her fatigue. (AR 1176-1178.)

In March of 2015, Plaintiff was examined by Dr. Robert R. Jacobs, neuro-optometrist, who opined that Plaintiff's visual symptoms — blurred and double vision, light sensitivity, attention and concentration problems, headaches with reading, which are all common with patients suffering from long term concussion symptoms — intensified when she spent time on the computer or

reading. Upon testing, he diagnosed several vision problems, and he recommended that she wear lenses while working on the computer, recommended her for physical therapy to address her symptomology, and anticipated a subsequent program of visual therapy that would eventually allow her to return to work. As a result of his March 2015 examination, Dr. Jacobs opined in a letter dated May 2, 2016, that Plaintiff was not ready to return to work at this time. (AR 1298-1305.) Physical Therapist Heather Carr issued a report on March 23, 2015, whereby she noted that Plaintiff demonstrated poor single leg balance and centering, postural and breathing dysfunction, muscular imbalances and myofascial trigger points on her body. (AR 1470.) On March 29, 2015, Plaintiff was evaluated by Dr. Clark and found to have no restrictions of daily living, moderate difficulties in maintaining social functioning, insufficient evidence of deficiencies of concentration, persistence or pace and no episodes of decompensation. Plaintiff was found to have psychological or behavioral abnormalities associated with a dysfunction of the brain evidenced by mood disturbance and emotional impairment in impulse control. Dr. Clark based her evaluation on observations of the Plaintiff in a controlled office setting, as opposed to objective data. (AR 1185-1187.)

On May 4, 2015, Physical Therapist Heather Carr reported that Plaintiff was tolerating between 5 minutes and 1 hour of walking, but she had more fatigue and pain on days following the days when she did more walking. She experienced tachycardia and some nausea when moving from supine to sitting and sitting to standing; this improved when she directed her visual attention elsewhere. (AR 1469.)

On May 13, 2015, Plaintiff had an office visit with Dr. Heechin Chae, at MedStar, who took over for Dr. Kraus. Dr. Chae reviewed Plaintiff's records and medications and noted that Plaintiff complained of blurry vision, numbness, loss of balance, anxiety and depression.

Plaintiff's pain was a 7/10. Dr. Chae ordered a sleep study for Plaintiff and he asked her to talk to Dr. Clark and suggested that she pace herself and work on improving her confidence, which had been affected by the loss of her career, leisure activities and her identity because of her injuries. Dr. Chae suggested further that Plaintiff work with her current PT and engage in vision therapy in the future. (AR 1328-1331.) On May 18, 2015, Plaintiff met with Dr, Clark, and they devised a plan for reimplementing strategies for organization and pacing. Plaintiff was scheduled for a follow-up n two weeks because of her low mood. Dr. Clark opined that mood, pacing and management of stress were areas requiring further intervention. (AR 1427-1428.) On June 26, 2015, Plaintiff had a follow-up visit with Dr. Chae, and she reported the same complaints as previously reported. Plaintiff was to taper off the Zoloft and replace it with Wellbutrin, and once that was done, she would engage in a neurostimulant trial. Plaintiff would also participate in speech therapy for her cognitive disorder. (AR 1333-1336.)

The July 10, 2015 treatment note by Dr. Clark regarding Plaintiff's office visit indicates that Plaintiff was attempting to address her light sensitivity, eye pain and sleep disturbances by wearing an eye mask at night and sunglasses frequently. She was in physical therapy to build her stamina and endurance. Plaintiff reported negative emotions regarding not being able to work at the present time. Plaintiff discussed mentoring young employees at her former place of employment. (AR 1319-1320.) On August 28, 2015, Plaintiff followed up with Dr. Chae, and she reported that the Wellbutrin was working well, and the PT improved her balance, but her sleep was slightly worse. Plaintiff complained of chest pain at rest and with exertion, shortness of breath, dizziness, headaches, nausea and thirst. Her pain was rated an 8/10. Dr. Chae suggested a trial of Amantadine, a neuro-stimulant, to improve frontal lobe function and decrease negative symptoms, and an increase in Wellbutrin. (AR 1337-1340.) Notes from an office visit on October 9, 2015

with Dr. Clark indicated that Plaintiff was struggling with financial stress and relationship issues. (AR 1321.)

In a report dated September 11, 2015, Plaintiff's Physical Therapist, Heather Carr, indicated that Plaintiff had been making steady progress, but she still continued to have significant impairments with auditory sensitivity, POTS, headaches, neck and jaw pain, which impacted her ability to read, work at a computer, or perform prolonged activity tasks, and as such she was unable to fulfill functional requirements for working. Plaintiff was engaged in physical therapy for at least six months during 2015 with Physical Therapist Heather Carr. (AR 1468.)

Plaintiff followed up with Dr. Chae again on October 9, 2015, and she reported that while she noticed improvement with Amantadine, she stopped it because it was giving her random twitches. Her pain was rated a 7/10. Plaintiff was going to switch back to Zoloft and continue with the vestibular therapy but hold off on vision therapy. (AR 1343-1345.) Plaintiff also followed up with Dr. Clark on October 9, 2015, where she reported that she had been coping pretty well during the last few months although she was dealing with a lot of stress. They discussed breaking stressors into manageable parts and Plaintiff possibly finding a family therapist. (AR 1431)

Treatment notes from November 13, 2015 by Dr. Clark indicate that Plaintiff was more positive about her improvement in her physical condition and cognitive process. Dr. Clark encouraged Plaintiff to set reasonable goals for herself, as it was noted that she tended to have very high expectations with resulting negative emotional reactions when these expectations were not met. (AR 1432.) On November 24, 2015, Dr. Gregory J. O'Shanick from the Center for Neurorehabilitation Services conducted an evaluation of Plaintiff. Dr. O'Shanick noted that Plaintiff felt she had reached a plateau and wanted to get better. (AR 1476-1512.)

Ms. Tanja Hutbacker, Vocational Rehabilitation Services, opined on January 15, 2016, that Plaintiff was unable to return to work at this time due to her symptomatology related to POTS and injuries from her April 2012 concussion. She stated that, on a good day, Plaintiff could perform tasks for about 4-5 hours per day, with 2-3 breaks per day, ranging in time from 5-30 minutes each depending on the level of stress and stimuli during the active periods. The frequency of bad days was dependent on stress and activity. On a bad day, she collapses due to loss of stamina and blood pressure issues. On bad days, she can do about 30 minutes of simple activity followed by a 60 minute break. (AR 1514-1519.)

On February 8, 2016, Dr. Weiss completed a POTS Residual Functional Capacity ("RFC") Questionnaire, which indicated that Plaintiff's prognosis was guarded with significant improvement unlikely. Dr. Weiss noted that Plaintiff experienced lightheadedness, extreme fatigue, exercise intolerance, visual disturbances, headaches, muscle pain, weakness, fainting confusion, nausea, constipation, dizziness and self-reported impairment in short-term memory or concentration that is severe enough to cause a substantial reduction in previous levels of occupational, educational, social, or personal activities. Plaintiff also had experienced a racing heart and drop in blood pressure. Plaintiff's workday was frequently interrupted by her fatigue, dizziness or other symptoms that interfered with her attention and concentration. Plaintiff was found to be incapable of even "low stress" jobs because she could not sustain stimuli and exertion for an extended period, and she needed to be able to rest frequently and take unpredictable unscheduled breaks. At one time, she could sit for 45 minutes, stand for 20 minutes, and during the course of the day, she could sit for two hours and stand/walk for less than two hours. Dr. Weiss opined that Plaintiff would likely be absent from work about four days per month. (AR 1405-1409.)

On May 31, 2016, Plaintiff was admitted to Sibley Memorial Hospital for approximately five days for treatment of a mediport infection. (AR 1550-1562.) On July 17, 2016, Plaintiff was evaluated by Dr. Gregory O'Shanick, who noted her thirteen diagnoses and concluded that her "chronic and permanent neurological, neuromedical and neurobehavioral disorders result in her being unable to engage in substantial gainful employment[.]" (AR 1547.) Dr. O'Shanick opined that Plaintiff was unable to verbally and visually process information in a timely manner or to communicate efficiently. She was at risk for falls and her ability to interact with her co-workers or supervisors was compromised as was her ability to plan, due to her fatigue, hypertension, headache, and her need to be out of work at least three times per month. *Id.*

On July 24, 2016, Dr. Jacobs opined that Plaintiff suffers from symptomology that is consistent with her concussion and dysautonomia, and she was showing modest gains since beginning treatment. Dr. Jacobs noted that when Plaintiff was exposed to sustained periods of work on a computer, fluorescent lighting and noisy environments, her condition worsened. Even with controlled exposure to stimuli, she experienced headaches and dizziness. Accordingly, he concluded —based on his clinical observations— that Plaintiff could not endure the exposure required from full and consecutive days of work, which would cause her condition to deteriorate. (AR 1549.)

2. Function Reports

Plaintiff filed her Function Report on May 21, 2014, noting limitations in standing, walking, sitting, completing tasks, and concentration. Plaintiff indicated that she had to put her IV bag on for two and one-half hours each morning. In the morning, she awoke at 6:30 a.m., ate breakfast, straightened the house and helped to get her children out the door for school She sometimes walked her children to school. Her day was spent making phone calls, taking a walk,

making herself a simple meal, resting in the afternoon, reading for about an hour, and sometimes making dinner. After dinner, she would read, watch television or draw before going to bed at 9:00 p.m. She described being dizzy or fatigued when she tried to dress or wash her hair and using an alarm clock to remind herself of her medications. A nurse would stop by once or twice a week to check on her and she would get a three-hour long injection of gamma globulin. She indicated that she could drive a car and shop for groceries by leaning on the cart for support. She could pay bills, but she was not always accurate. She could shop for short periods online or play games on the computer once a week, watch television once a month, read twice a week, but she did so less often than previously because she would get dizzy and fatigued. She had an alarm on her phone to remind her to go places and usually needed someone to accompany her to places that had a lot of stimuli, such as her son's soccer games and church, as the stimuli made her too weak to drive home. She indicated that she had trouble squatting, bending, standing, reaching, walking, sitting and kneeling because of dizziness and weakness. She indicated further that she had short term memory loss and difficulty understanding, following instructions and with concentration, and that she would write down instructions and read them several times. She had ringing and pain and pressure in her ears. Plaintiff stated that she did not handle stress well – she became weak and collapsed when under stress, or she would get irritable. She had to have a routine to keep herself on task. She sometimes used a cane that had been prescribed. She was taking Ritalin and Zoloft. (AR 243-252.)

Plaintiff's husband filed a Function Report-Third Party on June 10, 2014. He indicated that his wife was easily fatigued and in near constant pain, weak and unsteady after exertion, with limited mental focus. Stress or too much stimuli caused her to collapse and she often woke up during the night. She could go to her doctor's appointments, occasionally care for the children or

make dinner, do light housework, occasionally go grocery shopping, try to walk, but she often needed assistance and always had to plan everything carefully. She struggled to complete tasks and was forgetful and unreliable. She sometimes used a cane, walker or wheelchair. She could follow short instructions but was overwhelmed if instructions were complicated. He estimated that his wife did about 10% of what she used to do. (AR 264-272.)

3. Testimony at the Administrative Hearing

At the Administrative Hearing, (*see* AR 47-71), Plaintiff testified that her past employer accommodated her POTS by permitting her to do IV infusions at work, hold meetings with her feet up, work a reduced schedule, rest as needed, avoid evening appointments, have her own office and an assistant, and work from home some Fridays. Plaintiff noted that in a typical week, she might drive three to four times a week, to take her daughter to school, which was two miles away, and she saw her friends a couple times a week. When she traveled by airplane, she had to allow for 1-2 days of rest afterwards. At the time of the Hearing, Plaintiff was seeing Dr. Weiss for her POTS, Dr. O'Shanick for her concussion, and Dr. Jacobs for visual therapy. Plaintiff was using Nuedexta for concussion syndrome, Midodrine, Mestinon, a saline IV treatment, and Imitrex for migraines, as needed.

Plaintiff had stopped using some of her prior medications because of negative side effects such as brain fog and exhaustion. Plaintiff stated that she experienced some negative side effects from her current medication, such as a racing heart, and brain fog, but the side effects were not as severe as before. Plaintiff could walk 20-30 minutes, and she estimated that she could stand for about 15 minutes before needing to sit down or sit for an hour before needing to stand up because she got dizzy or lightheaded. On a bad day, Plaintiff was effectively bedridden, and this occurred about one day per week. Plaintiff had trouble with her concentration that varied depending on the

surrounding noise and stimuli.  She rarely went grocery shopping and only occasionally used the computer. She could read for 30 minutes, take a long break, and read for 30 minutes more.  Plaintiff described her typical day as getting up, having coffee, resting for thirty minutes, doing some physical therapy exercises, making breakfast, resting, making calls to make medical appointments, paying some bills or straightening the house a bit, resting, making lunch, resting, medical appointments, resting, and then at 3:00 p.m.,, doing her IV bag for the 2 and ½ hour infusion.[6]  In a typical day, plaintiff rested about three hours total, broken up over six breaks.  She indicated that she was not doing infusions that often because she no longer had a port.  A nurse was coming by to do the peripheral IV once or twice a week for 2 and ½ hours each time, although when Plaintiff missed infusions, it sometimes took four hours to do one. (AR 47-71.)

Charlotte Dixon, the Vocational Expert, testified that Plaintiff had done sedentary skilled work previously, but with her restrictions, she could not perform that past work.  Instead, based on the hypotheticals posed by the ALJ, Ms. Dixon testified that Plaintiff could be a hand packager, food service worker, or janitor, all unskilled occupations at the medium exertional level; a merchandise marker, router, or housekeeper, all unskilled occupations at a light exertional level; or a document preparer, surveillance systems monitor, or addresser, all unskilled occupations at the sedentary exertional level.  (AR 72-76,)

## B. Legal Framework for Determining Disabilities

An individual must have a "disability" to qualify for disability benefits under the Social Security Act (the "Act").  *See* 42 U.S.C. § 423 (a).  Under the Act, a "disability" is defined as a condition that renders the applicant unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not

---

[6] Plaintiff did not describe the remainder of her day, as she was asked additional questions.

less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A claimant must support her claim of impairment with "[o]bjective medical evidence" that is "established by medically acceptable clinical or laboratory diagnostic techniques."  42 U.S.C. § 423(d)(5)(A).

The SSA has established a five-step sequential analysis for determining whether a claimant is disabled and entitled to disability benefits.  *See* 20 C.F.R. § 404.1520.  At step one, the claimant must show that she is not presently engaged in substantial gainful employment.  *Id.* § 416.920(a)(4).  If the answer is yes, the ALJ will find that the claimant is not disabled.  *Id.* § 416.920(a)(4)(i).  If the answer is no, the ALJ moves to step two, where the claimant must show that she has a "severe medically determinable physical or mental impairment" or a combination of sever impairments that meets certain duration requirements under the regulations.  *Id.* § 416.920(a)(4)(ii).  If the claimant has such impairment or impairments, the analysis will move to step three, where the claimant must show that her impairment meets or equals an impairment listed in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments").  *Id.* § 416.920(a)(4)(iii).  If her impairment is listed, then she is conclusively presumed disabled and the inquiry ends here.  *Id.* § 416.920(d).

If the impairment is not listed, the ALJ continues to step four to assess the claimant's residual functional capacity ("RFC") and "past relevant work."  20 C.F.R. § 416.920(a)(4)(iv).  In determining a claimant's RFC, the ALJ must consider the tasks that can be performed by a claimant despite any physical or mental limitations, and the ALJ will evaluate medical, physical and mental factors; [the claimant's] descriptions of [her] impairments and limitations; relevant medical

evidence; and other relevant evidence." *Mandziej v. Chater*, 944 F. Supp. 121, 131 (D.N.H. 1996); 20 C.F. R. §404.1545. The claimant must show that her impairment prevents her from performing her "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). If the claimant remains capable of doing past relevant work, the ALJ will find the claimant is not disabled. *Id.* If the ALJ determines that the claimant is not capable of doing his past relevant work, the ALJ's analysis moves to step five, the final step, to assess whether there is other work that the claimant could do, considering the claimant's "residual functional capacity, . . . age, education, and work experience." 20 C.F.R. § 416.920(a)(4)(v). If the ALJ determines that the claimant is not capable of adjusting to other work, the ALJ will find that the claimant is disabled. *Id.*

The claimant bears the burden of proving the first four steps, and then the burden shifts to the Commissioner at step five to produce evidence of jobs that the claimant can perform. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004); *see also Smith v. Astrue*, 935 F. Supp. 2d 153, 158 (D.D.C. 2013). The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's vocational factors and RFC. If the claim survives these five steps, then the claimant is disabled and qualifies for disability benefits. *See* C.F.R. § 404.1520(a)(4).

### C. The ALJ's Decision

On December 23, 2016, ALJ Andrew Emerson issued a decision finding that Plaintiff was not entitled to disability benefits. (AR 18-37.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 9, 2012. At step two, the ALJ found that Plaintiff had the following severe impairments: " degenerative disc disease of the cervical spine; mitochondrial metabolic defect/Postural orthostatic hypotension syndrome (POTS) with autonomic neuropathy, vestibular disorder, pseudobulbar affect, and dysexecutive

syndrome; diabetes insipidus/autoimmune disorder; status-post Bard Port catheter implantation with Groshong catheter; depression; adjustment disorder; post-traumatic stress disorder; and attention deficit disorder." (AR 20.) The ALJ found further that Plaintiff had several impairments which were found to be non-severe: right-sided periplymph fistula and status post right tympanomastoidectomy and perilymphatic fistula dissection and repair; auditory processing disorder; fibromyalgia; chronic fatigue syndrome; post-concussive syndrome; migraines; cellulitis of the mediport site and mediport infection; visual diagnose including convergence excess, convergence insufficiency, post-traumatic vision disorder, binocular vision dysfunction, and suppressions; cognitive communications disorder. (AR 20-22.) The ALJ considered Plaintiff's vestibular symptoms and her difficulty with balance, fatigue, and hypersensitivity with regard to Plaintiff's severe impairments.

At step three, the ALJ evaluated Plaintiff's physical and mental impairments and determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ characterized Plaintiff as having: (1) a mild restriction in activities of daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties in concentration, persistence or pace; and (4) no episodes of decompensation. (AR 22-23.)

Accordingly, the ALJ moved to step four, where he found that Plaintiffs had the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)." (AR 24.) At this step, the ALJ indicated that he considered Plaintiffs' symptoms, the consistency of such symptoms with "objective medical evidence and other evidence," and opinion evidence, as required pursuant to the SSA regulations. (AR 24.) In his analysis, the ALJ determined that while "the claimant's medically determinable impairments could reasonably be expected to produce [her] alleged

symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision." (AR 26.) The ALJ considered and weighed the following information: (1) medical evidence from tests conducted in December 2012 and 2013, which he noted as "largely normal or benign" (AR 26); (2) clinical findings by Plaintiff's treating neuropsychiatrists, Drs. Kraus, Chae and O'Shanick, which he characterized as "normal" or "largely benign" (AR 26-27); (3) the results of Plaintiffs' independent medical examination with occupational medicine specialist Dr. Myerson, portions of her physical therapy evaluation notes and visual testing findings; (4) medical records associated with Plaintiff's trips to the emergency room in June and December of 2014, with results that he found "normal" (AR 27); (5) her treatment history and mental health treatment history, including treatment by her psychologist, Dr. Clark and neuropsychiatrist, Dr. O'Shanick; (6) discussion of other medical findings; and (7) Plaintiff's reported activities of daily living and the third-party function report by her husband (to which he assigned limited weight). (AR 26-29.)

Furthermore, the ALJ assigned the following weights to medical provider opinion evidence: (1) substantial weight to [some of] the opinions of Dr. Kraus, neurologist; (2) significant weight to a few of the physical limitations opined by Dr. Weiss, Plaintiff's primary care provider, and less weight (modest weight) to the other limitations opined by Dr. Weiss; (3) modest weight to the opinions of Dr. Clark, psychologist; (4) minimal weight to Dr. Maravell, doctor of oriental medicine and acupuncturist; (5) modest weight to Dr. O'Shanick, neuropsychiatrist; (6) modest weight to the opinion of Heather Carr, physical therapist (while noting that she is not an acceptable medical source); (7) modest weight to the opinions of Dr. Jacobs, neuro-optometrist; (8) modest weight to the opinion of Dr. Myerson, independent medical examiner; (9) modest weight to the

opinion of the vocational rehabilitation consultant Tanja Hubacker, M.A.; (10) moderate weight to the opinions of the State agency medical consultants who found the Plaintiff capable of performing medium work; and (11) substantial weight to the opinions of the State agency psychological consultants. (AR 30-35.)

The ALJ found that the RFC assessment was supported by "objective clinical signs of record" regarding Plaintiff's physical limitations, the "mental findings of record," a "relatively conservative treatment history," and Plaintiff's "activities of daily living[.]" (AR at 35-36.) He concluded that although Plaintiff could not perform her prior work, there was light, unskilled work that the Plaintiff could perform.

## II. Standard of Review

The Social Security Act, 42 U.S.C. § 405(g), permits a plaintiff to seek judicial review, in a federal district court, of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party." *See also Contreras v. Comm'r of Social Security*, 239 F. Supp. 3d 203, 206 (D.D.C. 2017). This Court must uphold the Commissioner's determination "if it is supported by substantial evidence and is not tainted by an error of law." *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987); *see also* 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The substantial evidence test requires "more than a scintilla, but . . . something less than a preponderance of the evidence." *Fla. Mun. Power Agency. v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). A court may not reweigh the evidence or supplant the SSA's judgment of the weight of the evidence with its own. *Maynor v. Heckler*, 597 F Supp. 457, 460 (D.D.C. 1984). Instead, a court must scrutinize the entire record

and give "considerable deference to the decision rendered by the ALJ and the Appeals Council." *Crawford v. Barnhart*, 556 F. Supp. 2d 49, 52 (D.D.C. 2008).

Despite the deferential nature of the standard, courts must give the record "careful scrutiny" to "determine whether the Secretary, acting through the ALJ, has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits." *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (citations and internal quotation marks omitted). An ALJ may not merely disregard evidence which does not support his conclusion. *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000). "A reviewing court should not be left guessing as to how the ALJ evaluated probative evidence," and it is "reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence." *Id.* (citations omitted); *see Simms*, 877 F.2d at 1050. A court, however, "may not reweigh the evidence and replace [the Commissioner's] judgment regarding the weight of the evidence with its own." *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation omitted).

### III. Analysis

As previously noted, Plaintiff contends that the ALJ:

(1) ignored the time off work and time off task required for Ms. Ruppert's required medical treatment; (2) failed to state his specific reasons for deciding that Ms. Ruppert's impairments, alone or in combination, did not meet or medically equal any of the listings in 20 C.F.R. Pt. 404, Subpt. P; (3) failed to find Ms. Ruppert disabled under Listing 4.05 (recurrent arrhythmias) and Listing 12.02 (neurocognitive disorders); (4) misstated the record with regard to the frequency, duration, intensity, and severity of her disabling symptoms; (5) having significantly misstated Ms. Ruppert's daily activities, was left with only the inaccurate and impermissible, sole rationale that her symptoms were unsupported by objective evidence; (6) failed to explain how he reached his conclusions regarding Ms. Ruppert's residual functional capacity in his question to the vocational expert, including working on a regular and continuing basis; and (7) failed to give controlling weight to the well-supported opinions of four of her treating specialists.

Pl.'s Mot. for Reversal, ECF No. 13, at 1-2 (substituting numbers (1)-(7) above for letters (A)-(G) in the original). Each of these arguments will be addressed in turn.

## A. Calculation of Time Off Work

Plaintiff argues that the ALJ's decision erroneously failed to weigh the time off task that she would require for her medical treatment, with specific reference to the fact that she normally received daily 2.5 hour saline infusions. Plaintiff contends that a finding of disability was required due to uncontradicted evidence of her inability to work full-time, *i.e.,* on a regular and continuing basis, eight hours a day, 40 hours a week. *See* Pl.'s Mem., ECF No. 13-1, at 24 (referring to *SR 96-8p: Assessing Residual Functional Capacity*, 1996 SSR LEXIS 5 at 1, 3, 5.)

Defendant asserts that Plaintiff has not presented evidence that her infusion appointments would cause her to miss work, as she "was able to schedule her appointments around her demanding job at Booz Allen as well as her travel schedule[.]" Def.'s Mot., ECF No 14, at 24.[7] This assertion ignores the accommodations that Booz Allen provided to the Plaintiff to facilitate her working there while receiving IV Saline infusions. Plaintiff testified that when she was working, the "home care nurse would come into [her] office sometimes and if [she] was having an eight-hour day, [she] would do IV therapy there." (AR 71.) She testified further that:

> We would have certain days and times, they knew that I would have to close a door and rest, so we wouldn't have meetings scheduled during that time. And then I never worked full time except for, I always worked 80% or less, except for that one good year from 2011 to 2012, and that was the year that I was able to work full time, still doing the IVs in the morning for the two and a half hours and - - or it I had to in the office and still with those accommodations, even though I was working full time, Wednesdays I wouldn't have any meetings, and then I'd try to alternate on Fridays working from home.

(AR 71.)

---

[7] Defendant references parts of the record noting that Plaintiff traveled to California to visit her family and to Paris to celebrate her wedding anniversary, and she took a spring break trip with her family to Costa Rica, but the record makes no mention of how Plaintiff dealt with her Saline IV infusions during those trips.

Plaintiff notes that the Vocational Expert testified that a claimant would not typically be able to do IV infusions at work and if that person needed to miss a day per week to do the infusions, she would be unemployable. (AR 76.) Furthermore, her IV infusions were prescribed by Dr. Weiss to be administered at 2:30 p.m. daily (AR 621, 627, 629, 1055, 1074-1075), for a period of 2.5 hours, although she acknowledges that timing was not always possible. (AR 1033-1034.) Moreover, her documented hospitalizations and in-facility treatments and tests "would have totaled more than 30 days of absence in 2013," and the effect of these absences were not addressed by the ALJ. Pl.'s Mem., ECF No. 13-1, at 25.

Defendant SSA contends that the ALJ was "not required to assume" that Plaintiff needed to schedule her appointments during work hours. Defendant references Potomac Home Health Care records showing that Plaintiff had flexibility in scheduling her Saline IV treatments insofar as many occurred between 7:00 to 7:40 a.m. Def.'s Mot., ECF No. 14, at 24; AR 1037, 1039, 1040, 1041, 1044, 1045, 1048, 1049, 1051-54, 1056, 1058-61, 1069-70. Defendant ignores however that the balance of Plaintiff's Saline IV treatments occurred during normal business hours. *See* AR 1036-1072.

Defendant challenges Plaintiff's extrapolation of days missed from work, citing *Barnett v. Apfel*, 231 F. 3d 687, 691 (10th Cir. 2000) for the proposition that [in that case] the plaintiff's extrapolation of days missed from work was faulty because it assumed entire days off for each appointment. Plaintiff in the instant case has not however claimed a full day off for each appointment; rather, Plaintiff's extrapolation of missed days is based on a claimed two hours each day. Pl.'s Reply, ECF No. 16, at 7. This Court finds that Defendant has provided no explanation for the ALJ's failure to address the calculation of Plaintiff's time off work and the resultant effect on Plaintiff's ability to work, despite the evidence in the record that Plaintiff required Saline IV

infusions and other medical treatment on a regular basis. Accordingly, this case shall be remanded to the SSA for consideration of this issue involving calculation of Plaintiff's time off work.

**B. The ALJ's Reasons for Deciding that Plaintiff's Impairments did not Meet or Medically Equal any of the Listings**

Plaintiff argues that the "ALJ rejected wholesale the fact that [Plaintiff's] impairments met or medically equaled several listings" and therefore, he did not adequately support his step three finding. Pl.'s Mem., ECF No. 13-1, at 26-27. In support thereof, Plaintiff cites to a snippet from one paragraph in the ALJ's Decision, (AR 22), ignoring the ALJ's statement that the "specific signs, symptoms, findings and functional limitations are discussed under the residual functional capacity finding below" and the subsequent detailed discussion of these items. *See Clark v. Astrue*, 826 F. Supp. 2d 13, 21 (D.D.C. 2011) (explaining that an ALJ need not repeat a discussion of findings throughout each step of the sequential analysis) (citation omitted).

In considering the ALJ's Decision as a whole, the Court finds that the ALJ's discussion of the evidence is sufficient for this Court to understand his reasoning. *See Callaway v. Berryhill*, 292 F. Supp. 3d 289, 296 (D.D.C. 2018) ("sufficient information has been provided for the Court to understand [his] reasoning.") (quoting *Grant v. Astrue*, 857 F. Supp. 2d 146, 154 (D.D.C. 2012)); *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 36 (D.D.C. 2014) ("the ALJ 'buil[t] a logical bridge from the evidence to his conclusion,' by thoroughly evaluating the evidence, explaining which evidence was persuasive and supported by the record, and comparing the objective medical evidence to Plaintiff's subjective testimony") (quoting *Banks v. Astrue*, 537 F. Supp. 2d 75, 84 (D.D.C. 2008)). Accordingly, the Court finds that the ALJ adequately articulated his step three finding, and Plaintiff's challenge to the ALJ's Decision on this ground is denied.

## C. Disability under Listing 4.05 (Recurrent Arrhythmias)

Plaintiff indicates that the ALJ's listing discussion does "not mention Listing 4.05, set forth its requirements, or set forth the evidence demonstrating that the listing's requirements were met" and accordingly, "the Court cannot ascertain whether the ALJ even knew that Listing 4.05 was at issue."[8]  Pl.'s Mem., ECF No. 13-1, at 28.  Plaintiff alleges that she meets the requirements for this Listing, but it "cannot [be] discerned from the record the ALJ's basis for rejecting [the evidence]." *See Butler v. Barnhart,* 353 F.3d 992, 1002 (D.C. Cir. 2004) (finding an ALJ's reasoning for rejecting certain opinions "not simply "spare". . . in crucial particulars [,] [but] missing.")

Defendant argues that the Plaintiff focuses on only a single criteria of that Listing, while ignoring other criteria that the Plaintiff does not meet.  Defendant concludes therefore that "the [L]isting does not apply and did not warrant an explicit comparison of the criteria to Plaintiff's medical evidence."  Def.'s Mot., ECF No. 14, at 26; *see Peters v. Comm'r Soc. Sec. Admin.*, Civ. A. No. 17-2371, 2018 WL 4223155, at *4 (D. Md. Sept. 5, 2018) ("Neither the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment.") (citation omitted).  Defendant then launches into a discussion of why Plaintiff does not meet the criteria set out in Listing 4.05; however, it is not for this Court to determine whether or not Plaintiff meets the requirements of the Listing.  Instead, the Court must focus of whether or not the ALJ should have considered this Listing and better explained why or why not the requirements were met.  In this

---

[8] Listing 4.05 requires proof of:  "Recurrent arrythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled [ ] recurrent . . .  episodes of cardiac syncope or near syncope despite prescribed treatment [ ] and documented by resting or ambulatory (Holter) electrocardiography, or by appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope."  10 C.F.R. pt. 404, Subpart B, app 1, 4.05.

case, Plaintiff's Disability Report repeatedly notes her allegations that she suffers from "postural orthostatic tachycardia syndrome," (AR 228-242), so unlike in *Peters, id.*, there is an indication in the record that Plaintiff allegedly suffers from this type of impairment. Accordingly, this case shall be remanded to the SSA for consideration of whether or not Plaintiff met the requirements of Listing 4.05.

### D. Disability under Listing 12.02 (Neurocognitive Disorders)

Plaintiff alleges that she was disabled under Listing 12.02, because she met both the A and B criteria. Listing 12.02 provides in relevant part:

> 12.02 Neurocognitive disorders [ ] satisfied by A and B, or A and C:
> A. Medical documentation of a significant cognitive decline from a prior level of functioning in ore of more of the cognitive areas:
> 1. Complex attention;
> 2. Executive function;
> 3. Learning and memory;
> 4. Language;
> 5. Perceptual-motor; or
> 6. Social cognition.
> AND
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
> 1. Understand, remember, or apply information;
> 2. Interact with others;
> 3. Concentrate, persist, or maintain pace;
> 4. Adapt or manage oneself.

20 C.F.R. § pt. 404, Subpt. P, App. 1 at 12.02 (internal citations omitted).

The parties focus their arguments on the ALJ's findings with regard to the part B criteria. Plaintiff contends that the ALJ "rejected Ms. Rupert's post-concussive syndrome on the ground that she returned to work for six months after her first [concussion]" without mentioning it was part-time or that she had additional concussions. Pl.'s Mem., ECF No. 13-1, at 29. Furthermore, Plaintiff argues that the ALJ considered diagnostic imaging, but concussions "have their own diagnostic criteria, which the ALJ ignored." *Id.* Moreover, she asserts that her post-concussive

symptoms were severe and caused her difficulty with activities of daily living such as reading, watching television, and gauging distance; she could not sustain her pace because she needed to rest; and she was irritable and had emotional and behavioral problems. *Id.* at 30.

As a preliminary matter, Defendant notes that an "extreme" limitation means an inability to function in this area "independently, appropriately, effectively, and on a sustained basis" and "marked limitation" signifies that the "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(f)(2)(d),(e). In assessing paragraph B criteria, the Commissioner considers only limitations resulting from *mental disorders*. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(1) (emphasis added). Accordingly, Defendant argues that Plaintiff's references to post-concussion symptoms bear no relationship to Listing 12.02. Defendant proffers additionally that the ALJ "thoroughly and carefully considered the evidence related to Plaintiff's mental limitations," Def.'s Mot., ECF No. 14, at 31, and he concluded that Plaintiff did not have marked or extreme limitations in her mental functioning. *See* AR 22-23, 27-29. The Court agrees that the ALJ "built a logical bridge from the evidence to his conclusion," regarding the extent of Plaintiff's mental limitations when he evaluated the evidence, explained what was persuasive and supported by the record, and compared objective evidence to Plaintiff's subjective statements. *Banks v. Astrue*, 537 F. Supp. 2d 75, 84 (D.D.C. 2008) (citation and quotation omitted).

Defendant contends further that the objective evidence considered by the ALJ need not be re-weighed simply because the Plaintiff references medical treatises and contends that such objective evidence should have been considered differently. *See Cunningham v. Colvin*, 46 F. Supp. 3d 26, 36 (D.D.C. 2014) (wherein the court had "carefully scrutinize[d] the entire record," and [would] not — and could not — "reweigh the evidence and replace the [SSA Commissioner's]

judgment regarding the weight of the evidence with its own," which is what the plaintiff sought). The Court finds that the ALJ adequately articulated his findings regarding Listing 12.02, and accordingly, Plaintiff's challenge to the ALJ's Decision on this ground is denied.

**E. The ALJ's Evaluation of the Record regarding the Frequency, Duration, Intensity, and Severity of her Disabling Symptoms and the Rejection of Plaintiff's Credibility**

Plaintiff contests the ALJ's statement of the record with regard to limitations affecting her daily activities and her ability to sustain such activities during the day, and she claims that the ALJ ignored that she was unable to perform such activities without taking significant rest breaks throughout the day. While the ALJ indicated without further explanation that "claimant reported some difficulty with certain tasks including personal care and some household chores and reading," he indicated that she was able to:

(1) drive several times a week, including picking up her daughter from school;

(2) attend church occasionally,

(3) travel to California for six weeks during the summer;

(4) walk her children to school;

(5) fix meals, including her own daily simple meals;

(6) do some household chores;

(7) go outside daily; and

(8) attend church and soccer practice/games once a week.

(AR 22.) The ALJ characterized Plaintiff's restriction in activities of daily living as "mild." *Id.*

The ALJ did not mention that Plaintiff's husband had to "accompany [her] to [her] son's soccer games and church because the stimuli from th[o]se activities ma[d]e her too weak to drive home" or that she needed to be reminded to go places. (AR 52, 259, 266-268.) Nor did the ALJ

mention that Plaintiff uses a cane, prescribed in 2012, "a couple times per week for support [while walking]," and she also had a walker that was prescribed in 2013. (AR 261, 270.) *See also* AR 719, 733 (noting an unsteady gait).  Plaintiff drove about three to four times a week (AR 52), when she felt well enough to drive, and she limited her driving to 30 minutes or less, for doctor's appointments, occasional grocery shopping or to pick up her daughter at school.  (AR 52-53, 247, 267.)  Plaintiff noted that her daughter's school was "two point one miles" away, and they were in a carpool.  (AR 64.) Plaintiff testified that "maybe once or twice a week, I'll take her [my daughter] in [but] [u]sually my husband does on his way out [and] [s]he's also capable of walking."  (AR 64.)  She noted that her son took public transportation to school.  (AR 64.)  Plaintiff had previously indicated, in her Function Report, that she walked her children to school "a couple times a week." (AR 244).

Plaintiff testified further that when she went to California to visit her family, she spent her time "[m]ostly with [her] parents" and "[m]ostly just hanging out," as she was at their home, but if she was feeling good, she would "walk with [her] mom."  (AR 66.)[9]  After flying, she planned on "one or two days of not doing anything [ ] after."  (AR 53-54.)  With regard to household chores, she indicated that she rarely did laundry, but she made the bed a couple times a week, straightened the house daily (with breaks), took out the trash and loaded and unloaded the

---

[9] The ALJ found unsupported Dr. Clark's opinion that Plaintiff was unable to function outside a "highly supportive living arrangement" based on the fact that Plaintiff "lived in California for 6 weeks visiting her parents during the alleged period of disability as well as vacation[ing] in Paris, France and Costa Rica." (AR 32.)  At the beginning of the hearing, Plaintiff's counsel indicated that Plaintiff ended up in the hospital after she flew to Paris, as it was "just too much, just the trip there."  (AR 49.)  Plaintiff testified that she and her husband used to go to Paris but then she "got too sick."  (AR 54.)  On this trip, which was their 15th anniversary, they went because her husband had business there and their family and friends are there. (AR 54.)  She testified that while she was in Costa Rica with her family for a spring break trip in April 2014, she "relaxed by the pool" and "[went] bird watching."  (AR 66.)

dishwasher every other day, although she "sometimes" was not able to complete the loading/unloading of the dishwasher or straightening of the house, and she has to rely on her husband. (AR 62, 246.) Plaintiff noted that she only cooked simple foods because she has difficulty standing for more than 15 minutes and bending and reaching to get items out of cabinets and carrying pots and pan, (AR 276), and her husband stated that it took her longer to cook because she is forgetful and has trouble following recipes. (AR 266.)

In her Function Report from May 2014, Plaintiff explained that she could walk for about 15 minutes before resting for 5 minutes; she has difficulty sitting for more than 30 minutes; and she rests in the afternoon for about an hour. Her husband primarily takes care of their two children, and her sister-in-law and neighbors also help out. She could shop for groceries while leaning on a cart for support. She has to take breaks while on the computer because she gets dizzy with eye and ear problems. (AR 244-251.) She described her typical day as: getting up and dressed at 6:30 a.m., eating breakfast, straightening the house, helping get the children ready and sometimes walking them to school, doing her IV treatment and making phone calls, eating lunch, taking a walk, having a rest, helping make a meal and then reading, watching television or drawing before showering and going to bed by 9:00 p.m. (AR 244.)

During her testimony over two years later, Plaintiff described her "bad" days when she was "pretty much bedridden" as occurring about once a week, while her "bad" days with 4-5 good hours occurred "about every other day." (AR 61.) She noted that since her mediport came out, she collapses about 1-2 times per week. *Id.* She experiences weakness as if she might collapse, and that feeling could last from 30 minutes to two hours. (AR 59-60.) As described by her, a typical day involves rest periods liberally distributed through the day. (AR 63-65.) She experiences 1-2 migraines per week. (AR 57, 323-324.) She can stand for about 15 minutes or sit

for about an hour before getting dizzy and lightheaded (AR 59.)  During her travels, she relaxed and did nothing too strenuous.  (AR 53-54, 66.)  She worried about her predictability and stamina. (AR 61-62, 1285.)  She had trouble with her balance when she was having a bad day or if she overexerted herself. (AR 60).  She shopped for groceries rarely, used the computer occasionally, and was able to read in two stretches of 30 minutes each with a long break in between. (AR 60-62.)

The ALJ noted that Plaintiff took care of her children.  (AR 23.)  He further indicated that she helped them with homework and did gardening, but both of these statements are contradicted in the record.  *See* AR 65 ("[My kids] don't need my help [with homework]"); AR  53 (where Plaintiff responded "[n]o" to the question if she still gardens, and she indicated that she "wasn't [ever] really an avid gardener.") The ALJ also relied upon a statement in a medical report that stated Plaintiff led her daughter's Girl Scout troop meeting (AR 22 -23), but Plaintiff indicated that she has never had a troop meeting in her home although she once helped out with a picnic. (AR 66.)

Defendant notes that Plaintiff relies solely on "her own testimony and subjective description" of her symptoms as a whole, while the ALJ was required to weigh this with the rest of the evidence. Defendant asserts that the "credibility determination is solely within the realm of the ALJ." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012).  Defendant explains that this determination entails a two-step process to determine "whether a claimant's symptoms affect her ability to perform basic work activities." *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 297 (D.D.C. 2018) (citing 20 C.F.R. Section 404.1529).  The first step requires that the ALJ determine whether the claimant's medically determinable impairments could reasonably be expected to produce the alleged subjective symptoms. *Id.*, 20 C.F.R. Section 404.1529(a)-(b).  The second step requires

that the ALJ evaluate the intensity and persistence of the symptoms and determine the extent to which the symptoms limit the claimant's capacity to work. *Callaway*, 292 F. Supp. 3d at 297; 20 C.F.R. Section 404.1529(c)(1). A claimant's allegations alone do not establish disability. *See* 20 C.F.R. Section 404.1529.

Plaintiff notes that the ALJ "accepted [her] complaints only to the extent that they were supported by and consistent with objective findings and test results and other evidence (meaning his version of daily activities and state agency doctors)." Pl.'s Mot., ECF No. 13-1, at 33. Plaintiff asserts however that "most of [the medical] evidence cited as supporting the ALJ's credibility finding is unrelated to any of the limitations [the claimant] described in [her] testimony." Pl.'s Reply, ECF No. 16, at 15 (citation omitted). Plaintiff provides several examples, one of which is that the "ALJ inaccurately found [Plaintiff's] migraines non-severe on the grounds that her MRI and EEG were normal, AR 21, but neither of those tests are diagnostic for migraine." Pl.'s Mot, ECF No. 13-1, at 34 (citing medical websites discussing migraine diagnosis). The ALJ also focused on Plaintiff's normal "visual acuity," AR 27, which was not an issue according to her optometrist, Dr. Jacobs. Rather, Plaintiff had "'vestibular symptoms' with a dysfunctional binocular vision system," resulting from post-concussive overstimulation of her visual system, and "she fatigued easily with paperwork and suffered headaches and dizziness with sustained reading or computer activities." Pl.'s Mot., ECF No. 13-1, at 35 (citing AR 1298.)

Plaintiff concludes that because the ALJ omitted much of the information that conflicted with his conclusions, "[t]he judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored." *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986). The administrative process relies upon the ALJ's decision containing "[an]

accurate accounting of [the individual's] abilities, limitations, and restrictions." *Butler*, 353 F.3d 992, 1000 (D.C. Cir. 2004).  Plaintiff proffers that if the ALJ believed her statements about the household chores she could perform, he should have explained why he discredited her statements about needing rest. *See Mascio v. Colvin*, 780 F. 3d 632, 636-38 (4th Cir. 2015) (finding that while the ALJ determined what functions he believed the claimant could perform, his opinion was "sorely lacking in the analysis needed " to review his conclusions, in part because the ALJ said nothing about the claimant's ability to perform those functions for a full workday); *Keeton v. Comm'r of Soc. Sec.*, 583 Fed. App'x 515, 527-28 (6th Cir. 2014) (where it was found to be unclear whether the ALJ would have reached the same conclusions had she not mischaracterized the record and omitted medical opinions).

After reviewing the ALJ's [10-2] Decision, the Court agrees with the Defendant's statement that the ALJ "recounted, at length, Plaintiff's subjective complaints,"  Def.'s Mot., ECF No. 14, at 33, but that alone does not satisfy this Court's inquiry.  In the instant case, the ALJ "explained that he found [Plaintiff's] medically determinable impairments could reasonably be expected to produce the above alleged symptoms," but he also found that Plaintiff's "complaints about the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence." (AR 26.)  What gives this Court pause is that when the ALJ discussed objective medical evidence, clinical findings, and medical opinions, it is not entirely clear from the record whether he purposefully discounted or simply ignored certain medical opinions and evidence. *See, e.g.,* the opinions of Dr. Kraus (AR 698-706, 712-715, 717-735, 872-876, 1003-1007, 1091.)

By way of example, the ALJ gave substantial weight to Dr. Kraus's May 15, 2014 opinion that the "claimant ha[d] moderate limitation of functional capacity and [was] capable of light work

and ha[d] moderate limitation with regard to mental/nervous impairment and [was] able to engage in only limited stress and limited interpersonal relationships," but the ALJ failed to mention Dr. Kraus's proviso that Plaintiff's prognosis was "guarded as she [was] still symptomatic" or her notation that Plaintiff was close of achieving her maximum medical improvement, or the fact that Dr. Kraus left blank a return-to-work date. (AR 30, AR 1090-1091.)

Nor did the ALJ mention Plaintiff's visit to Dr. Kraus on July 2, 2013, or her visit on July 18, 2014. At the July 2, 2013 visit, Dr. Kraus noted that, after seeing some progress the prior visit and discussing a return to work, Plaintiff had experienced a setback after she was hospitalized due to a port that was infected, and she had no port for POTS therapy. (AR 722.) Her vestibular symptoms were worse, and she was found "unable to return to work at this time due to neurologic symptoms." (AR 724-725.)

At the July 18, 2014 visit, Dr. Kraus noted that Plaintiff was "doing better with increased Ritalin [but] then she overdid it by going to a play and she was symptomatic for [a] day and a half with nausea and vomiting." (AR 1003.) Plaintiff reported that she had surgery in June and the dizziness had improved but the tinnitus was worse; she still had increased sensitivity to noise and light; her migraines had increased from 2 per month to every couple days; she was fatigued and had sleep problems; and she had leg pain. Dr. Kraus reported that Plaintiff did better on her tandem gait test and her concussion overall was assessed as improved, but she was showing persistent symptoms of vestibular and cognitive dysfunction. Plaintiff was referred to a Tinnitus Clinic, given another referral (to a clinic) and told to continue with Dr. Clark. In addition to Plaintiff's

then-current medications, she was given methylphenidate to be used twice per day and asked to follow-up in 12 weeks.[10]

The ALJ seems to have focused on those aspects of Dr. Kraus's medical records and opinions that supported his conclusion regarding Plaintiff and either ignored or perhaps rejected the rest. By way of example, the ALJ's discussion of Plaintiff's May 6, 2013 visit with Dr. Kraus indicated that "in May 2013, Dr. Kraus indicated that the claimant's affect was much brighter at that visit and Dr. Kraus did not note any ongoing observed deficits of orientation, speech, attention, concentration, memory, through process, thought content, and good/intact judgment and insight . . ." This description ignores Dr. Kraus's report that Plaintiff: (1) showed findings consistent with cognitive disorder; (2) was very aggravated by too much sensory stimulation; (3) was still "very impaired;" (4) used a memory notebook; (5) had an improved gait, but still some unsteadiness; and (6) wanted to return to work, with Dr. Kraus suggesting a limited basis to start. (AR 717-721.)

Furthermore, in discussing Plaintiff's subjective claims regarding dizziness and fatigue, the ALJ found that while such claims are somewhat supported by the findings, they are not supported by her reported activities of daily living." (AR 27.) As noted above, however, the ALJ's summary of Plaintiff's daily activities was not entirely consistent with the record in the case and/or it also leaves out pertinent facts.[11]

─────────────────

[10] At the July 18, 2014 visit with Dr. Kraus, Plaintiff had been prescribed the following medications: (1) Ddavp Rhinal Tube Soin, twice daily; (2) Sumatriptan (nasal spray); (3) Midodrine Hcl Tabs, three times a day; (4) Klor-Con M20 Tabs , once a day; (5) Normal Saline Flush, via her mediport daily for two hours; (6) Ritalin, a half tab twice a day; (7) Buffered Salt Tabs; and (8) Vicodin as needed; (9) Zoloft once a day: and (10) low dose aspirin. (AR 1003 - 1004.)

[11] The ALJ focused at several points in his Decision on Plaintiff's ability to drive (3-4 times per week) — to the grocery store occasionally or her doctors' appointments or to pick up her daughter — "despite her alleged symptoms [of dizziness and collapsing]." (AR 29, 30, 52.) During the hearing, Plaintiff testified that she does "[n]ot normally" have trouble driving." (AR 52.)

Additionally, the ALJ characterized Plaintiff's treatment history as "largely conservative in nature and successful in improving her symptoms." (AR 27.) This characterization is at odds with some of the medical opinions and evidence that discuss Plaintiff's surgery to try to resolve her dizziness, her ongoing need for infusions, the side effects of Plaintiff's various medications, and the trajectory of ups and downs that Plaintiff experienced with her various medical symptoms.

Accordingly, the Court finds deficient the ALJ's evaluation of the record evidence pertaining to his characterization of Plaintiff's daily activities and his subsequent analysis of the frequency, duration, intensity and severity of her disabling symptoms, which is based in part on that characterization of the record evidence. Accordingly, the case is remanded to the SSA for reevaluation of the record evidence pertaining to these issues.

**F. The Basis for the ALJ's Decision about Plaintiff's Ability to Perform Functions in the Hypothetical Question to the Vocational Expert**

When the Vocational Expert testified at the July 19, 2016 hearing, the ALJ provided the following set of assumptions:

> [A]ssume a person of the claimant's age, education and work experience who is limited to medium work, . . . and can only occasionally climb ramps and stairs, balance, stop, kneel, crouch and crawl. The individual can never climb ladders, ropes and scaffolds. Further, the individual can only frequently rotate, flex, extend the neck. The individual can only frequently reach overhead. The individual would need to avoid concentrated exposure to extreme heat, as well as concentrated exposure to wetness. As well as concentrated exposure to excessive noise, as well as concentrated exposure to excessive vibration. As well as moderate exposure to hazardous moving machinery and unprotected heights. Further, the individual could only perform simple, routine and repetitive tasks in a low

---

Furthermore, the ALJ found Plaintiff's ability to "travel cross-country by herself inconsistent with her allegations of dizziness and collapsing. (AR 29.) It should be noted that the ALJ assumed Plaintiff traveled to California alone when the only discussion regarding the California trip indicated that her husband drove her to the airport (AR 53) and she stated that her husband or kids went surfing, which was either a reference to their time in Costa Rica or in California (AR 66).

stress work environment with low stress defined as no strict production quotas and the individual can only occasionally interact with the public, co-workers and supervisors.

(AR 72-72). The ALJ then modified this scenario to assume "light" work, (AR 74), and this modification was utilized in the RFC noted in the ALJ's Decision. (AR 24.)

In his Decision, the ALJ gave:

significant weight to the limitations of lifting up to 20 pounds occasionally, frequently sitting, never climbing ladders, and occasionally performing all other postural activities, and modest weight to the other imitations with regard to those activities and less weight to the opinion that the claimant is incapable of sedentary work and the limitations on reaching grasping, fine and gross manipulations, the specific hour limits on sitting, standing, and walking, and the need for shifting at will and unpredictable, unscheduled breaks and monthly absences.

(AR31.). There was however little considered discussion of these physical limitations in the ALJ's Decision.

The ALJ's RFC assessment is "designed to determine the claimant's uppermost ability to perform regular and continuous work-related physical and mental activities in a work environment." *Butler v. Barnhart*, 353 F. 3d at 1000 (citing SSR 96-8p). "In effect, it is a "function-by-function" inquiry based on all of the relevant evidence of a claimant's ability to do work and must contain a "narrative discussion" identifying the evidence that supports each conclusion." *Id.* This function-by-function analysis includes an assessment of an individual's ability to sit, stand, walk, lift, carry, push and pull, but it does "not require written articulation of all seven strength demands." *Clark v. Astrue*, 826 F. Supp. 2d 13, 22-23 (2011); *see also Banks v. Astrue*, 537 F. Supp. 2d at 85 (finding that the ALJ need not discuss irrelevant and uncontested functions). Plaintiff asserts that in the instant case, the ALJ "identified what he did not believe," but he failed to explain how the limitations affected the Plaintiff's abilities and to describe the evidence supporting each conclusion. Pl.'s Mot., ECF 13-1, at 36. This Court agrees that the ALJ

failed to build a "logical bridge" from the evidence to his findings about Plaintiff's RFC. *See Banks v. Astrue*, 537 F. Supp. 2d 75, 84 (D.D.C. 2008)

The general rationale propounded by the ALJ to account for the various weights he assigned was instead based on Plaintiff's "normal brain MRI and EEG," her "largely normal gait," and no "ongoing deficits with regard to strength, sensation or reflexes." *Id.* The ALJ relied further on Plaintiff's "largely conservative" treatment history and her "activities of daily living," *id.*, factors which this Court has already determined to be subject to review. *See* Section III E. above. The Court finds that information provided by the ALJ in connection with his determination of Plaintiff's RFC is insufficient for this Court to understand his reasoning. Accordingly, this case should be remanded to the SSA with regard to determination of Plaintiff's RFC and an indication of the evidence supporting any limitations affecting Plaintiff and an explanation of how such limitations affect her abilities.

### G.    The Weight Given by the ALJ to Plaintiff's Treating Physicians

Plaintiff asserts that "[c]ontrolling weight must be given to the well-supported opinions of treating physicians." Pl.'s Mem., ECF No. 13-1, at 38. Under this Circuit's treating physician rule, when a "claimant's treating physicians have great familiarity with [his] condition, their reports must be accorded substantial weight." *See Butler v. Barnhart*, 353 F.3d at 1003 (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)). A treating physician's medical opinion is entitled to "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial record evidence. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Butler*, 353 F.3d at 1003 ("A treating physician's [opinion] is binding on the fact-finder unless contradicted by substantial evidence.") Generally, the ALJ will also give more weight to a physician if the physician has had a longer

treatment relationship with the plaintiff, a higher frequency of examination of the plaintiff, or a specialty in a relevant medical area. *See* 20 C.F.R. § 404.1527(c). The ALJ need not adopt the ultimate opinions of medical providers that Plaintiff could not work, as such opinions are conclusions reserved to the Commissioner, that are not due significant weight. *See Smith v. Berryhill*, Civ. No. 15-1521, 2017 WL 4174420, at *4 (D.D.C. Feb. 24, 2017) (finding that terms like "permanent disability" are reserved for the Commissioner)(citing 20 C.F.R. § 404.1527(d)(1)).

An ALJ must provide "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527 (c)(2), 416.927(c)(2); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, *5 (July 2, 1996). If the ALJ "rejects the opinion of a treating physician, [he shall] explain his reasons for doing so." *Butler*, 353 F.3d at 1003 (citation omitted). The ALJ's reasons must be "sufficiently specific to make clear to [the court]" why the ALJ assigned that weight. SSR 96-2, 1996 WL 374188 at *5.

The role of the district court is "not to determine whether the treating physician's opinion should have been accorded controlling weight; instead, it is to determine whether the ALJ's decision was supported by substantial evidence." *Holland v. Berryhill*, 273 F. Supp. 3d 55, 63 (D.D.C. 2017). Accordingly, this Court is not going to engage in a reweighing of the evidence but will instead review whether the ALJ's decision not to give Plaintiff's treating physicians controlling weight was supported by substantial evidence in this case. In this case, the four treating physicians at issue are: (1) Dr. Jessica Clark, a neuropsychologist; (2) Dr. Allen Weiss, Plaintiff's primary care physician; (3) Dr. Robert Jacobs, an optometrist; and (4) Dr. Gregory O'Shanick, a neuropsychiatrist who treated Plaintiff for a relatively brief period of time.

This Court notes that, in this case, the underpinnings of the ALJ's decision to assign less than controlling weight to the opinions of these physicians was based at least in part on his views

of the inconsistencies between their opinions and Plaintiff's "largely conservative" treatment history and her "activities of daily living." Earlier in this opinion, the Court noted flaws in the ALJ's reasoning with regard to these issues and remanded the case to the SSA for consideration of Plaintiff's daily activities. *See* Section III E. above. Furthermore, while the ALJ asserted that these physicians relied too heavily on Plaintiff's subjective complaints, a review of the record indicates that there is a significant amount of objective medical evidence in this case, which was not addressed by the ALJ. Moreover, the ALJ ignored the consistency between the opinions of Plaintiff's treating physicians who treated Plaintiff on a regular basis over a period of years. Accordingly, the Court remands this case back to the SSA for reevaluation of the weight given by the ALJ to Plaintiff's treating physicians.

## IV. Conclusion

Upon consideration of Plaintiff's [13] Motion for Judgment of Reversal and [13-1] Memorandum in support thereof; Defendant's [14] [Consolidated] Motion for Judgment of Affirmance/Opposition to Motion for Judgment of Reversal and Memorandum in support thereof; Plaintiff's [16] Reply; and the Administrative Record herein, for the reasons explained herein and based on the applicable legal standard of review, the Court shall GRANT IN PART and DENY IN PART Plaintiff's Motion for Judgment of Reversal and DENY Defendant's Motion for Judgment of Affirmance, with the effect that the case shall be REMANDED to the SSA for reconsideration of the following issues raised by Plaintiff: (1) calculation of Plaintiff's time off work: (2) whether or not Plaintiff met the requirements of Listing 4.05; (3) evaluation of the record evidence pertaining to Plaintiff's daily activities and the frequency, duration, intensity and severity of Plaintiff's disabling symptoms; (4) determination of Plaintiff's RFC regarding the evidence supporting any limitations affecting Plaintiff and how such limitations affect her abilities; and (5)

evaluation of the weight given to Plaintiff's treating physicians – Drs. Clark, Weiss, Jacobs and O'Shanick.

The ALJ's Decision with regard to the following issues is upheld: (1) the ALJ's Step 3 findings that Plaintiff's impairments did not meet or medically equal any of the listings; (2) the ALJ's adequate articulation of findings regarding Listing 12.02; and (3) any other aspects of the ALJ's Decision, which were unchallenged by the Plaintiff.

A separate Order accompanies this Memorandum Opinion.


DATED: January 13, 2020                    _____/s/_____
                                            COLLEEN KOLLAR-KOTELLY
                                            UITED STATES DISTRICT JUDGE